**Dated: July 21, 2021**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RAUL MANUEL RODRIGUEZ, JR., | ) | Case No. 20-10168-SAH |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ——————————————————— | ) | |
| | ) | |
| MIDFIRST BANK, a federally chartered savings association, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. 20-01047-SAH |
| | ) | |
| RAUL MANUEL RODRIGUEZ, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A stipulation by the parties sums up what they perceive to be the genesis of MidFirst

Bank's ("MidFirst") claim under 11 U.S.C. § 523(a)(2)(A)  – "There is a dispute whether

**[Rodriguez]** signed the Loan Documents and the Borrower Information Form or authorized his

signature to be placed on the same.  Mark Mathes has claimed in the past that . . . Rodriguez

authorized him to apply for and sign off on the loan with MidFirst Bank. []Rodriguez denies this." Stipulation Regarding Note and Guaranty, Plaintiff Ex. 38, ¶ B. The Court views the totality of the facts and circumstances as a classic case of false pretenses, justifying application of Section 523(a)(2)(A) to except MidFirst's claim from discharge.

## JURISDICTION

The Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I). Additionally, the parties consented to this Court's entry of final orders pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012.

## BURDEN OF PROOF

Exceptions to discharge under Section 523(a)(2)(A) must be narrowly construed with doubt being resolved in the debtor's favor. Bellco First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997). The creditor seeking to except a debt from discharge bears the burden of proving each element of its claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## FINDINGS OF FACT

The findings of fact are based on the testimony of defendant/debtor Raul Manuel Rodriguez, Jr. ("Rodriguez"), Mark Mathes ("Mathes"), Melissa Hickey, a business relationship manager with MidFirst ("Hickey"), and Susan Simper, a senior vice president and Director of Business Express for MidFirst ("Simper"), the Stipulations contained on pages 2 and 3 of the Pretrial Order [Doc. 28], filed on April 26, 2021 (the "Stipulations"), and the exhibits offered by

2

MidFirst and Rodriguez including the additional Stipulation Regarding Note and Guarantee [Plaintiff Ex. 38].

### Rodriguez, Mathes, and KRR

1. Rodriguez and Mathes are old friends (dating back to 2001) who occasionally worked together in the past on home construction projects. Stipulation 6. At various times, either Rodriguez or Mathes would essentially front the cost of a construction project by obtaining a loan for each other, which would later be paid off through a refinance. Rodriguez Testimony, Transcript, pp. 16-18, 37 (lines 14-20); Mathes Testimony, Transcript p. 94 (lines 2-11). This unique relationship is at the core of MidFirst's claim.

2. K&R Renovations, L.L.C. ("KRR") is an Oklahoma limited liability company organized by Rodriguez in 2007 and was in the construction business. Rodriguez is the 100% owner of KRR. Stipulation 5.

3. KRR had a bank account at BancFirst, opened when KRR was formed. Rodriguez Testimony, Transcript, p. 23 (lines 16-20).

4. Mathes owned Mark Mathes Construction, Inc. ("Mathes Construction"), which was also in the construction business. Mathes Testimony, Transcript, p. 81 (lines 13-22). Mathes Construction is no longer in operation and is "inactive" with the Oklahoma Secretary of State. Mathes Testimony, Transcript, p. 84, (lines 8-13).

### Mathes' Operating under KRR Name

5. In 2016, Mathes suffered financial setbacks, having been served with a number of lawsuits against himself and Mathes Construction. Rodriguez Testimony, Transcript, p. 27 (lines 4-19); Mathes Testimony, Transcript, pp. 85-86. Faced with the possibility

judgment creditors could execute upon his income and property, Mathes asked Rodriguez

if he could operate his construction business under the name of KRR.  Rodriguez

Testimony, Transcript, p. 29 (lines 3-10).

6.     Mathes also asked Rodriguez to open a bank account with MidFirst so he could conduct

business under the name of KRR, the limited liability company owned solely by

Rodriguez.  Mathes Testimony, Transcript, pp. 86-88; Stipulation 7.  Specifically, by

operating under the KRR name, Mathes sought to protect construction loan proceeds

from garnishment by his creditors.  Rodriguez Testimony, Transcript, p. 27 (lines 4-10).

7.     Rodriguez and Mathes would keep separate books and prepare and file tax returns

separately for their separate construction businesses under the KRR name.  Rodriguez

Testimony, Transcript, pp. 28-30.

8.     Rodriguez would operate out of the KRR bank account at BancFirst, and Mathes would

operate his construction business out of a bank account at MidFirst in KRR's name.

Rodriguez Testimony, Transcript, p. 29 (lines 3-16).

9.     In May 2016, Rodriguez and Mathes went in person, but separately, to the MidFirst

branch at 2101 SW 104th in Oklahoma City to open a bank account for KRR.  Rodriguez

Testimony, Transcript, p. 34 (lines 6-25).

10.     Rodriguez and Mathes opened a MidFirst account in the name of KRR, specifically

MidFirst Account 3401017632 (the "Account"), to enable Mathes to operate separately

from Rodriguez under the KRR name.  Stipulation 8; Plaintiff Ex. 1.

11.     The signature card for the Account (the "Account Signature Card") identifies Mathes as

"manager" and Rodriguez as a "member" of KRR.  Stipulation 8; Plaintiff Ex. 1.  The

signature card identifies 7900 SW 98th, Oklahoma City, Oklahoma, as KRR's address

(which was Mathes' then-physical address), Mathes' address as 9701 Olde Tuscany Rd,

Oklahoma City, Oklahoma, Rodriguez's address as 3504 SW 127th Street, Oklahoma

City, Oklahoma, and Rodriguez's social security number, phone number, and date of

birth. Plaintiff Ex. 1; Rodriguez Testimony, Transcript, pp. 67-69. The KRR address

was not the actual address for KRR. Rodriguez Testimony, Transcript, p. 67 (lines

21-25). Rodriguez gave MidFirst his social security number, phone number, and date of

birth. Rodriguez Testimony, Transcript, p. 69 (lines 13-16).

12. MidFirst obtained a copy of Rodriguez's Oklahoma Driver's License when the Account

was opened (the "First Driver's License"). Rodriguez Testimony, Transcript, pp. 69-70;

Defendant Ex. E. The First Driver's License was issued on July 13, 2012, and expired on

May 31, 2016. Defendant Ex. E.

13. The Account Signature Card was personally signed by Rodriguez on May 18, 2016, and

by Mathes on May 19, 2016. Rodriguez Testimony, Transcript, p. 69 (lines 6-12);

Mathes Testimony, Transcript, p. 89 (lines 6-25); Plaintiff Ex. 1.

14. A Resolution of Limited Liability Company for KRR, initialed, signed, and executed by

Rodriguez and signed and initialed by Mathes (the "Resolution"), was delivered to

MidFirst providing "[a]ll of the members of [KRR], validly organized and operating as

required by law, certify to [MidFirst] that the following is a true and complete copy of a

resolution duly adopted at a meeting of . . . all of the members of [KRR]." Mathes

Testimony, Transcript, pp. 90-91; Plaintiff Ex. 2.

15. The Resolution provides that Rodriguez is a Member and Mathes is Manager of KRR and, as such, are authorized signatures on the Account.  Plaintiff Ex. 2, pp. 3-4.

16. However, Mathes was never the manager of KRR; only Rodriguez was the manager of KRR.  Rodriguez Testimony, Transcript, pp. 35-36; Mathes Testimony, Transcript, pp. 84-85.  Mathes was only listed as manager of KRR on the Account Signature Card and Resolution in order to set up the Account.

17. Rodriguez and Mathes set up the Account solely for Mathes to run his construction business through; Rodriguez did not want to run any activity through the Account. Rodriguez Testimony, Transcript, pp. 35-36.  Nevertheless, Rodriguez had check signing privileges on the Account.  Simper Testimony, Transcript, p. 170 (lines 13-16).

18. All of the information regarding KRR obtained through the process of opening the Account was uploaded to MidFirst's computer system.  Hickey Testimony, Transcript, pp. 129 (lines 17-25) and 130 (lines 1-12).

### KRR Financial Woes

19. KRR began having financial problems in January 2019.  Rodriguez Testimony, Transcript, p. 26 (lines 2-16) and p. 38.  It was embroiled in litigation commenced in 2018 and was incurring legal fees and expenses defending the litigation.  Rodriguez Testimony, Transcript, pp. 38-40.

20. Eventually, Rodriguez decided to cease defending the KRR litigation and had a conversation with counsel about filing bankruptcy in March or April 2019.  Rodriguez Testimony, Transcript, p. 40, lines 8-20.

21. Rodriguez reached out to his bankruptcy counsel, Jerry Brown, again in June 2019, about filing bankruptcy and began the process of pulling the information together for his personal bankruptcy filing.  Rodriguez Testimony, Transcript, pp. 40-41.

22. Rodriguez communicated his bankruptcy plans to Mathes.  Mathes was concerned Rodriguez's bankruptcy would result in a closing of the Account and impact his ability to complete construction projects.  Rodriguez Testimony, Transcript, pp. 41-42

### The Loan

23. Ignorant of the foregoing facts regarding KRR's financial woes, on September 25, 2019, Hickey contacted Mathes, as manager of KRR based on the Account records, to discuss the possibility of KRR obtaining an SBA guaranteed loan from MidFirst (the "Loan"). Stipulation 9; Hickey Testimony, Transcript pp. 129-130.  Only existing MidFirst customers meeting set criteria were eligible to apply for the Loan.  Hickey Testimony, Transcript, pp. 134 (lines 13-16) and 136 (lines 6-11); Simper Testimony, Transcript, p. 166 (lines 5-23).  Hickey contacted Mathes first by telephone and then by text, because he was listed as the manager of KRR in MidFirst's electronic records.  Hickey Testimony, Transcript, pp. 132-134.

24. As SBA required any owner with a 20% or more interest in a borrower to supply a guarantee, the proposed Loan required a guaranty from Rodriguez, as the only member of KRR.  Hickey Testimony, Transcript, p. 137 (lines 5-18).

25. Mathes expressed an interest in such a loan.  Stipulation 9.

26.  Mathes approached Rodriguez about the MidFirst offer to make the Loan on

September 27, 2019, by text.  Rodriguez Testimony, Transcript, p. 46-48; Plaintiff Ex. 5.

Rodriguez specifically asked Mathes, "How much are we borrowing?"  Plaintiff Ex. 5.

27.  The Loan application process was completed by Mathes through the Lightspeed Loan

Platform, an electronic loan platform used by MidFirst based on established banking

procedures.[1]  Hickey Testimony, Transcript, pp. 128 (lines 19-21), 131 (lines 10-12);

Simper Testimony, Transcript, pp. 164-165.  A MidFirst customer must satisfy certain

credit criteria to be eligible to apply for a loan using the Lightspeed Loan Platform.

Hickey Testimony, Transcript, pp. 134 (lines 13-16) and 136 (lines 6-11). Simper

Testimony, Transcript, p. 166 (lines 5-23).  Then, the borrower must qualify and be

approved through the application process before a loan is made.  Simper Testimony,

Transcript, pp. 166 (lines 21-25) and 167 (lines 1-5).  If approved, and it is an SBA loan,

the borrower must also complete the SBA Form 1919 and meet the additional

requirements of the SBA.  Simper Testimony, Transcript p. 167 (lines 5-17).

28.  KRR was eligible for the Loan in 2019 as otherwise no loan application would have been

generated in the Lightspeed Loan Platform.  Simper Testimony, Transcript, pp. 167

(lines 18-25) and 168 (lines 1-2).

---

[1]The Lightspeed Loan Platform is a fully automated online lending application
available to MidFirst customers meeting certain eligibility requirements for loans up to
$1 million.  Over 140 banks use the Lightspeed Loan Platform out of the 5,500 banks currently
offering digital loans per the Small Business Administration ("SBA").  Simper Testimony,
Transcript, pp. 164-165.  In simple terms, the Lightspeed Loan Platform is a software package
that allows MidFirst to make digital loans, customized and configured specifically for MidFirst.
Simper Testimony, Transcript, pp. 164-165.

29.     Generally, most of the information necessary for a loan application generated by the

Lightspeed Loan Platform comes from MidFirst's electronic records and is "pre-filled"

in the application by the Platform.  As KRR was an existing customer, most of the

information needed in the application process was auto-filled from MidFirst's electronic

records.  Hickey Testimony, Transcript, p. 135 (lines 13-22).

30.     Hickey filled out the Loan application based on information from the MidFirst computer

system and information provided by Mathes.  This was typical as most loan applications

require some banker assistance.  However, the entire process can be completed online

without a MidFirst banker and customer talking.  Simper Testimony, Transcript, p. 168

(lines 11-24).

31.     Mathes requested information from Rodriguez to complete the Loan application process

such as the city and state in which Rodriguez was born.  Plaintiff Ex. 5.  All necessary

information for completing the Loan process was either obtained from Mathes or

MidFirst's electronic records.  Hickey Testimony, Transcript, pp. 134 (lines 22-25) and

135 (line 1); Simper Testimony, Transcript, p. 177 (lines 16-20).

32.     The application process paused to allow MidFirst to authenticate KRR as a customer,

which Mathes could do as he was on the Account as manager of KRR.  Simper

Testimony, Transcript, p. 169 (lines 5-16).

33.     In the Lightspeed Loan Platform, MidFirst then asks the customer for an annual sales

revenue but does not verify such figure prior to approving the loan and accepts the figure

provided.  Simper Testimony, Transcript, p. 169 (lines 17-21).  Mathes provided the

9

$2.2 million annual revenue figure contained in the Loan application.  Hickey Testimony, Transcript, p. 135 (lines 2-6).

34.   Next, the customer is asked to validate the Social Security number by restating what is already in MidFirst's computer records as another validation point.  Simper Testimony, Transcript, pp. 169 (lines 17-25) and 170 (lines 1-3).  Finally, the customer is asked to verify ownership.  Simper Testimony, Transcript, p. 170 (lines 4-12).

35.   At this point, the required disclosures were sent to KRR at its email address on record.  Simper Testimony, Transcript, p. 170 (lines 17-25).

36.   An automated credit check is then run within seconds. SBA loans are offered to customers with a credit score between 680 and 719, and Rodriguez's credit score was 717.  Simper Testimony, Transcript, pp. 171 (lines 1-15), 172 (lines 3-15), and 175 (lines 2-16); Plaintiff Ex. 11.

37.   A loan is approved based on credit score of the applicant, an existing MidFirst customer and guarantor, and not the ability to pay.  Hickey Testimony, Transcript, p. 155 (lines 2-10); Simper Testimony, Transcript, pp. 171 (lines 16-25) and 172 (lines 1-2).

38.   The Lightspeed Loan Platform then performed the due diligence for the Loan by checking Dun & Bradstreet public records report to confirm KRR's stated agent, address, entity, and phone number matched MidFirst records, LexisNexis for business address and fraud markers, and other checks available in the lending platform including defaults on any government guaranteed loans and the Oklahoma Secretary of State.  Simper Testimony, Transcript, p. 173 (lines 2-21); Plaintiff Ex. 11 and 12.

39.  Based on the results of the Lightspeed Loan Platform due diligence, MidFirst offered the Loan to KRR as a $100,000 secured term loan, which was then accepted by KRR. Simper Testimony, Transcript, p. 176 (lines 14-15).

40.  At this point, additional information is required by SBA, and, if the information provided does not satisfy SBA requirements, the loan will not move forward.  Simper Testimony, Transcript, p. 176 (lines 15-24).

41.  Hickey obtained the SBA required information for KRR from Mathes over the phone to complete the SBA Form 1919. Simper Testimony, Transcript, p. 177 (lines 16-25); Plaintiff Ex. 9.

42.  As long as the information from MidFirst's records and that provided by the borrower fits the credit criteria for the loan, no further investigation or documentation is required. Simper Testimony, Transcript, p. 178 (lines 5-9).

43.  Once the Lightspeed Lending Platform recognized the Loan application process was completed, a DocuSign session began with an email to KRR advising that the last 4 digits of Rodriguez's Social Security number was the security code necessary to access the DocuSign documents that would come in a separate email.  A second email was then sent to KRR with a link which opened the DocuSign session for the Loan by KRR inputting the last 4 digits of Rodriguez's social security number.  Simper Testimony, Transcript, p. 178 (lines 5-16).  MidFirst did not provide the last four digits of Rodriguez's Social Security Number; KRR was required to know it.  Simper Testimony, Transcript, p. 178 (lines 17-23).

44. After opening the link in the second email by inputting the last 4 digits of Rodriguez's Social Security number, KRR was presented with the following documents and requirements once the DocuSign session was opened:

    a.    Promissory Note and Security Agreement as static, pre-filled documents which KRR could only sign and initial or exit;

    b.    Commercial Guaranty as a static, pre-filled document which Rodriguez could only sign and initial or exit;

    c.    Certification of Beneficial Ownership which required KRR to input personal information in open fields for the owner of 20% or more of KRR, specifically the owner's social security number, birth date, and driver's license information including the number, issuance date and expiration date.  This required information was not supplied by MidFirst; KRR was required to input this information.  If KRR had not input this information, KRR and Rodriguez would have been unable to sign the Loan Documents.

Simper Testimony, Transcript, pp. 179-181; Hickey Testimony, Transcript, pp. 142-144; Plaintiff Ex. 15, 16 and 21.

45. Rodriguez's Oklahoma Driver's License in effect when the Loan was entered was issued on May 18, 2016, expired on May 31, 2020, and identified Rodriguez's date of birth ("Second Driver's License").  Plaintiff Ex. 13.

46. On September 30, 2019, the Note, Guaranty, and Certification of Beneficial Ownership were electronically generated and signed.  Rodriguez's name and signature were affixed to all documents.  MidFirst is the holder of the Note and the Guaranty.  Stipulation 10; Defendant Ex. C; Stipulation Regarding Note and Guaranty, Plaintiff Ex. 38, ¶ A; Plaintiff Ex. 15, 16, and 21.

47. On the Note the address for KRR under Rodriguez's electronic signature as "Owner" is 7900 SW 98th, Oklahoma City, Oklahoma 73169 (which was Mathes' address at the time). Rodriguez Testimony, Transcript, pp 64-65; Plaintiff Ex. 15.

48. Other than Rodriguez's dispute with his signature on the Loan Documents, there are no enforcement/authentication issues with respect to the Loan Documents. Stipulation Regarding Note and Guaranty, Plaintiff Ex. 38, ¶ C.

49. The Loan proved to be a continuation of the strange financial mutuality between Rodriguez and Mathes. The September 27 text exchange contemplates KRR taking out the Loan and letting Mathes use the Loan proceeds and pay back the Loan, with Rodriguez possibly reaffirming the Loan in his bankruptcy case. Mathes Testimony, Transcript, pp. 111 (lines 15-25), 112 (lines 1-18), 123 (lines 17-25) and 124 (lines 1-4); Plaintiff Ex. 5. After giving a thumbs up, Rodriguez's only expressed concern was Mathes bailing on repayment of the Loan. Plaintiff Ex. 5.

50. Hickey had nothing to prove that Rodriguez was involved in the Loan Application process although she believed he was on one of the telephone conversations. Hickey Testimony, Transcript, pp. 146 (lines 20-25), 147 (lines 1-5) and 150 (lines 14-16). However, it is normal for MidFirst to talk about a loan exclusively with the manager of an LLC with no conversations with the guarantor as the manager generally takes care of such matters for an LLC. Simper Testimony, Transcript, p. 186 (lines 19-25) and 187 (lines 1-7).

51. On October 1, 2019, Mathes telephoned Rodriguez to tell him he completed the Loan application. Mathes Testimony, Transcript, p. 98 (lines 11-20).

52.     On October 2, 2019, the Loan was funded with net loan proceeds of $99,750 being

        deposited into the Account.  Stipulation 10.

53.     Rodriguez received none of the Loan proceeds; Mathes received all of them.  Rodriguez

        Testimony, Transcript, p. 74 (lines 16-22); Mathes Testimony, Transcript, pp. 119

        (lines 24-25) and 120 (lines 1-11).

54.     The "Loan Application Details" created by the Lightspeed Loan Platform identify the

        borrower as KRR, with an address of 7900 SW 98th, Oklahoma City, Oklahoma (Mathes'

        then-address), telephone number (405) 640-3658 (Rodriguez's phone number),

        Rodriguez's tax identification number, and an email builtbymark@gmail.com (Mathes'

        email).  Rodriguez Testimony, Transcript, pp. 70-71; Mathes Testimony, Transcript, pp.

        115-116; Defendant Ex. F.

55.     Rodriguez never had contact with MidFirst or Hickey regarding, or during the making of,

        the Loan or otherwise.  Rodriguez Testimony, Transcript, p. 52 (lines 9-25); Hickey

        Testimony, Transcript, pp. 53 (lines 1-5) and 141 (lines 22-25).

**<u>The Loan Default</u>**

56.     Rodriguez claims he only discovered the Loan was actually made in December 2019,

        when a MidFirst Loan statement, which had been sent previously to Mathes' address,

        was forwarded to Rodriguez's address based on a change of address form.  Rodriguez

        Testimony, Transcript, p. 53 (lines 13-19).  Mathes previously filed a change of address

        for KRR with the Post Office to Rodriguez's home address. Mathes Testimony,

        Transcript, p. 101 (lines 6-14).

14

57.   Rodriguez then texted Mathes and sent a picture of the Loan statement but received no response.  He then telephoned Mathes, who advised he could pay it back.  Rodriguez Testimony, Transcript, pp. 53 (lines 20-25) and 54 (lines 1-9).

58.   Mathes claims Rodriguez never accused him of taking out the Loan under KRR's name without Rodriguez's permission.  Mathes Testimony, Transcript, p. 99 (lines 17-25).

59.   Rodriguez then contacted his bankruptcy counsel, Jerry Brown, who allegedly advised him the Loan would be addressed in his bankruptcy case.  Rodriguez Testimony, Transcript, p. 54 (lines 10-19).

60.   Rodriguez never contacted MidFirst to advise it that his signature was improperly affixed to the Loan Documents, nor did he file a police report as to his purportedly forged signature on the Loan Documents.  Rodriguez Testimony, Transcript, p. 54 (lines 17-20).

61.   As of May 3, 2021, not less than $119,035.57 is owed on the Loan, exclusive of attorney fees and costs (the "MidFirst Claim").  Stipulation 12; Stipulation Regarding Note and Guaranty, Plaintiff Ex. 38, ¶ C.

62.   After KRR defaulted, Hickey reached out to Mathes and then to Rodriguez, neither of whom responded to her inquiries.  Hickey testimony, Transcript, pp. 139-140.

63.   Per Simper, there was nothing out of the ordinary or done improperly in the making of the Loan although there were a large number of Experion inquiries (in hindsight) but that is not part of the Loan credit criteria.  Simper Testimony, Transcript, pp. 192-194; Defendant Ex. N.

64.   KRR is no longer active with the Oklahoma Secretary of State.  Stipulation 13.

65. After KRR ceased operations, Rodriguez did use the Account to deposit some checks payable to KRR as KRR's BancFirst account was closed. Rodriguez Testimony, Transcript, p. 42 (lines 20-25).

66. On January 20, 2020, Rodriguez filed a voluntary petition under chapter 7 of the Bankruptcy Code. Stipulation 14.

## **Witness Credibility**

67. Rodriguez's confidence in his explanation of the financial facade created by Mathes and himself is belied by the hard evidence, rendering his explanations meaningless. In a nutshell, the evidence explicitly establishes Rodriguez expressly allowed Mathes to (i) operate under KRR's name (which was owned solely by Rodriguez) so as to allow Mathes to avoid paying creditors, (ii) claim to be the manager of KRR in opening the Account, and (iii) enter into the Loan as manager of KRR and use the Loan proceeds. His alleged efforts to assist Mathes was nothing more than a scheme to defraud creditors, including MidFirst. Any credibility Rodriguez claimed was undermined by the cold hard facts and his insistence to the contrary.

68. Mathes also gave poor excuses for his actions and lacked confidence in stating those excuses. Moreover, Mathes was noticeably uncomfortable in every respect while testifying. Mathes' credibility was decimated by his repeated, but blatantly false, representation that he was manager of KRR for all purposes with respect to MidFirst, from opening the Account to applying for the Loan when he was never, in fact, manager of KRR.

16

69.     Both Hickey and Simper were thorough, knowledgeable and entirely competent.  Their credibility is undeniable.

## CONCLUSIONS OF LAW

"[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  Grogan, 498 U.S. at 286 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  A completely fresh start is, however, limited to the "'honest but unfortunate debtor.'"  Grogan, 498 U.S. at 286-87 (quoting Local Loan Co., 292 U.S. at 244).  Section 523(a) reflects Congress' decision to exclude certain categories of debts from a debtor's discharge.  Burris v. Burris (In re Burris), 598 B.R. 315, 333 (Bankr. W.D. Okla. 2019) (citing Grogan, 498 U.S. at 287).  Many of the subsections of Section 523(a) aim to prevent discharge of debts involving a debtor's unacceptable conduct, such as dishonesty, fraud, or intentional injury, with Section 523(a)(2)(A) "embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'"  Cohen v. de la Cruz, 523 U.S. 213, 217 (1998) (citing Grogan, 498 U.S. at 287).  Section 523(a)(2)(A) places the congressional goal of preventing fraud as more important than allowing defrauders to start over with a clean slate. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (quoting Mayer v. Spanel Int'l LTD. (In re Mayer), 51 F.3d 670, 674 (7th Cir. 1995)).

17

I.    **SECTION 523(a)(2)(A) EXCEPTS FROM DISCHARGE DEBTS ARISING FROM FALSE REPRESENTATION, FALSE PRETENSES, OR FRAUD.**

Under Section 523(a)(2)(A), debts may be excepted from discharge if they are for money, property, or services obtained by a debtor's false representations, false pretenses, or actual fraud (other than a statement respecting the debtor's or an insider's financial condition).

A.    **Elements of the Three Types of Section 523(a)(2)(A) Claim**

Most Section 523(a)(2)(A) adversaries brought to except debts on account of a debtor's fraud involve misrepresentations.  See McClellan, 217 F.3d at 892-93.  The elements of the usual Section 523(a)(2)(A) claim for false representation are:  (i) the debtor made a false representation; (ii) the debtor made the representation with the intent to deceive the creditor; (iii) the creditor relied on the debtor's representation; (iv) the creditor's reliance was justifiable; and (v) the creditor was damaged as a proximate result.  Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996) (citing Grogan, 498 U.S. at 287), as modified by Field v. Mans, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).[2]

"'False pretenses' or 'representations' are representations knowingly and fraudulently made that give rise to the debt.'"  Pino v. Jensen (In re Jensen), 2019 WL 2403105, at *5 (10th Cir. BAP June 7, 2019) (citing Cobb v. Lewis (In re Lewis), 271 B.R. 877, 885 (10th Cir. BAP 2002)).  To prevail on a Section 523(a)(2)(A) claim on the basis of false pretenses, the creditor must establish:  (i) the debtor engaged in conduct "wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;" (ii) intent; (iii) causation; and (iv) damages.  DMM Group, Inc. v.

---

[2]Rodriguez's lack of actual involvement in the Loan process or knowledge of what was being communicated to MidFirst renders it impossible to find he made a false representation.

18

Hanna (In re Hanna), 603 B.R. 571, 592 (Bankr. S.D. Tex. 2019) (citing Novartis Corp. v.

Luppino (In re Luppino), 221 B.R. 693, 701-02 (Bankr. S.D. N.Y. 1998)).

Finally, fraud "connotes deception or trickery generally," and Section 523(a)(2)(A)

encompasses actual fraud that can be effected without a false representation.  Husky Int'l

Electronics, Inc. v. Ritz, 136 S.Ct. 1581, 1586 (2016).  In order to except a debt from discharge

under Section 523(a)(2)(A) based on actual fraud, the creditor must prove:  (i) the debtor

committed actual fraud; (ii) the debtor obtained money, property, services, or credit by the actual

fraud; and (iii) the debt arose from the actual fraud.  Hatfield v. Thompson (In re Thompson),

555 B.R. 1, 10 (10th Cir. BAP 2016).  However, no requirement exists that the creditor must have

relied on the actual fraud or parted with money or property as a result of the fraud.  Thompson,

555 B.R. at 11.[3]

The common thread between claims based on false representation, false pretenses, and

fraud remains the debtor's intent to defraud the creditor.  Houston v. Munoz (In re Munoz),

536 B.R. 879, 884 (Bankr. D. Colo. 2015).  For the reasons set forth below, this Court finds

Rodriguez intentionally took part in a classic case of false pretenses for which the debt evidenced

by the Loan should be excepted from his discharge.

## II.    THE DEBT IS EXCEPTED FROM DISCHARGE UNDER SECTION 523(a)(2)(A) BASED ON FALSE PRETENSES.

### A.    Rodriguez Actively Participated in Creating a False Impression of KRR.

False pretenses are simply "implied misrepresentations intended to create and foster a

false impression."  Tobias v. Alvarado (In re Alvarado), 608 B.R. 877, 883 (Bankr. W.D. Okla.

---

[3]Rodriguez did not receive any of the Loan proceeds or any other property as a result of the Loan, thereby eliminating actual fraud as a basis for the Section 523(a)(2)(A) claim.

19

2019) (citing <u>Marks v. Hentges</u> (<u>In re Hentges</u>), 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007)).

"[F]alse pretenses can be 'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" <u>Ray Klein, Inc. v. Webb</u> (<u>In re Call</u>), 560 B.R. 814, 821 (Bankr. D. Utah 2016) (quoting <u>Bank of Cordell v. Sturgeon</u> (<u>In re Sturgeon</u>), 496 B.R. 215, 223 (10th Cir. BAP 2013)).  The evidence presented at trial in this adversary proceeding establishes: (i) Rodriguez's intent and participation in a scheme to foster and create in MidFirst a misleading understanding of who and what KRR was; and (ii) MidFirst's misunderstanding regarding who and what KRR caused it to offer to loan and, in fact, loan $100,000 to KRR.

Rodriguez and Mathes have a history of "helping" each other through difficult financial circumstances including, without limitation, borrowing money for each other's use.  This pattern continued in 2016 when Rodriguez agreed to allow Mathes to operate his construction business under the name of KRR, Rodriguez's wholly owned limited liability company through which Rodriguez also operated a construction business.  Rodriguez and Mathes went to MidFirst to open the Account under the name of KRR through which Mathes would operate his construction business.  Rodriguez signed the Account Signature Card representing that Mathes was manager of KRR and Rodriguez was the member of KRR.  The Account Signature Card identified KRR's address as Mathes' then-physical address rather than KRR's or Rodriguez's actual addresses.  Rodriguez also signed the Resolution of Limited Liability Company for KRR certifying the address of KRR as Mathes' then-physical address, Mathes as the manager of KRR, and Rodriguez as the member of KRR.  However, at no time has Mathes been the manager of KRR

or has KRR operated from Mathes' physical address.  Rather, this scheme was simply a ruse to allow Mathes to continue his construction business during difficult financial circumstances and avoid creditor attachment and garnishment of his bank account.

And the ruse continued through 2019, even after KRR began having its own financial difficulties, and Rodriguez discussed filing personal bankruptcy with counsel and Mathes.  In late September 2019, Mathes contacted Rodriguez by text message to discuss the possibility of the Loan, saying, in relevant part:

| Author | Statement |
|---|---|
| Mathes | "MidFirst called wanting to give us a loan. . . Might as well get it and split it with me." |
| Rodriguez | "OK. . . How much are we borrowing?" |
| Mathes | "Up to $100k.  No paperwork.  Only a few companies get the call.  She called me.  So 5 yr term low interest.  Deposited in our account." |
| Rodriguez | "What are we doing with the money? I can't borrow and not pay it back.  Is that what your wanting to do?" |
| Mathes | "If you can re-affirm on it.  Maybe help build you back up too. I was going to see if you can let me use it and make the payment it'll build up my credit.  Maybe I could build a house with it later. . . . I can put my name on it to help my credit.  I'm almost 700 now." |
| Rodriguez | "That's fine, you just can't bail on the payment after I file." |

Rodriguez's own words are damning with respect to his knowledge of, and consent to, the Loan. Clearly, neither Rodriguez nor Mathes envisioned the Loan being a Loan to Mathes but rather a Loan to KRR, which was an existing customer of MidFirst.  Their conversation reflects their intentions clearly:  "give *us* a loan," "*split it with me*," "How much are *we* borrowing," "Deposited in *our* account," and "What are *we* doing with the money?"

21

While Rodriguez attempted to discredit his involvement with the Loan and suggest it was all Mathes' doing, the evidence establishes otherwise.  First, Rodriguez expressly consented to the Loan in texts with Mathes.  Second, while Mathes signed the Loan Documents rather than Rodriguez, Rodriguez necessarily was involved.  In order to complete the Loan Application, Rodriguez' birth state and city were required.  Mathes asked Rodriguez for this information, and Rodriguez provided it to Mathes.  The Lightspeed Loan Platform then required that the customer be validated – asking for the social security number of Rodriguez, as member and guarantor of the Loan, which number had to be entered  by the customer.  Consequently, since Rodriguez did not make the Loan Application, he necessarily had to provide Mathes with his social security number so KRR could be validated as a customer.  Moreover, when the Loan Documents were executed by KRR and Rodriguez in a DocuSign session, in order to initiate the session, the last four digits of Rodriguez's social security number were required.  Further, Rodriguez's driver's license number, issuance date, and expiration date were also required to be input in the DocuSign session – this information was different from Rodriguez's First Driver's License supplied when the Account was opened as such driver's license had expired and could not, therefore, be gleaned from information Midfirst had on file.  So, once again, this information was required to be provided by Rodriguez to Mathes in connection with the application for and granting of the Loan.

Rodriguez claimed he only learned of the Loan's existence in December 2019 when he received a MidFirst Loan statement.  While he reached out to Mathes about the Loan at this point, he took no steps to advise MidFirst he never authorized his signature on the Loan Documents as the only member of KRR or as the guarantor.  Such inaction speaks volumes in light of KRR's and Rodriguez's liability on the Loan.

22

The strange financial interdependency of Rodriguez, Mathes, and KRR is the cornerstone of MidFirst's false pretenses claim – Rodriguez and Mathes created an alternate reality where KRR was no longer Rodriguez's wholly owned limited liability company from which he alone conducted his construction business but rather a limited liability company from which both Rodriguez and Mathes conducted their construction businesses and of which Mathes was the manager. Quite simply, Rodriguez's actions and inactions[4] created and fostered MidFirst's false impression of the altered reality of KRR in order to protect Mathes from adverse creditor action. Moreover, it was necessary MidFirst buy into the altered reality as Mathes and Rodriguez wanted Mathes to operate his KRR business through a separate bank account. However, when the Loan offer was made, at a time when Rodriguez was intending to file bankruptcy, and then subsequently accepted by KRR, the illusory separation between Mathes and Rodriguez's business and affairs ceased. The Loan was theirs – Rodriguez's own words underscore this point.

Based on the evidence, Rodriguez engaged in a scheme with Mathes to create the false impression that Mathes' construction business was under the KRR umbrella and that Mathes was the manager of KRR. This scheme resulted in the opening of the Account and ultimately the making of the Loan to KRR.

---

[4]Rodriguez's silence in the face of the false impressions created by him at the time of (i) the opening of the Account (Mathes was not the manager of KRR and his business was separate from KRR), (ii) the making of the Loan (Mathes was not the manager of KRR and KRR would not be receiving or repaying the Loan proceeds), and (iii) the subsequent Loan default (Mathes allegedly forged Rodriguez's signature on the Loan Documents) is deafening. Trustmark Nat'l Bank v. Tegeler (In re Tegeler), 586 B.R. 598, 653 (Bankr. S.D. Tex. 2018).

**B.**    **Rodriguez Intended MidFirst to have a False Impression Regarding KRR.**

"Fraudulent intent for purposes of Section 523(a)(2)(A) can be shown by establishing that the debtor was a willing participant in a fraudulent scheme and thereby intended to deceive a creditor." Sturgeon, 496 B.R. at 223 (citing Holmes v. Nat'l City Bank (In re Holmes), 414 B.R. 115, 131-32 (E.D. Mich. 2009)).  Fraudulent intent under false pretenses requires a bankruptcy court to consider whether the totality of the circumstances present a picture of deceptive conduct by the debtor, thereby indicating an intent to deceive the creditor.  Tegeler, 586 B.R. at 658 (citing Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst), 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005)).

In this case, when viewing the facts in the aggregate, it is impossible to reconcile Rodriguez's actions with anything other than an intent to deceive or create a false impression with MidFirst.  First, Mathes expressly asked Rodriguez, and Rodriguez willingly agreed, to allow him to operate his construction business under the name of KRR, Rodriguez's wholly owned LLC.  Then, knowing he was the only manager of KRR, Rodriguez voluntarily signed the Account Signature Card on behalf of KRR falsely representing Mathes to be the manager of KRR and stating the address, phone number, and email of KRR to be those of Mathes.  Fast forward to 2019 – Rodriguez agreed with Mathes to have KRR apply for a $100,000 loan from MidFirst at a time when KRR was facing financial difficulties and Rodriguez was planning on filing for bankruptcy himself, with a clear understanding KRR was not going to receive the Loan proceeds.  And Rodriguez provided Mathes with certain confidential personal information necessary to complete the Loan.  Finally, at no point did Rodriguez ever suggest to MidFirst that

24

Mathes was not part of KRR or Mathes did not have the authority to act in all respects for KRR, which is Rodriguez's primary defense to MidFirst's claim.

The seed for this deception was planted in 2016 with the opening of the Account and continued through the making of the Loan. The evidence is clear Rodriguez willingly participated in a fraudulent scheme to cause MidFirst to believe Mathes to be manager and part of KRR, which is an absolute falsehood. Rodriguez acted with the intent to give MidFirst a false impression as to Mathes' involvement in, and authority to act on behalf of, KRR for over three years. In short, Rodriguez was an "active, knowing participant in a fraudulent scheme to deceive [MidFirst] . . . and that [Rodriguez] thereby intended to deceive [MidFirst]." Sturgeon, 496 B.R. at 224.

**C.    MidFirst was Induced to Make the Loan based on the False Pretenses Created by Rodriguez.**

The subterfuge of Rodriguez and Mathes deprived MidFirst "of its right to know to whom it was truly lending the money [and] the intended purpose of the [L]oan . . . all of which eventually resulted in [MidFirst] being duped into advancing" $100,000 under the Loan which has never been repaid. Tegeler, 583 B.R. at 654. No matter the protestations by Rodriguez that he did not authorize the Loan, he, together with Mathes, created a false impression Mathes had the authority to act on behalf of KRR beginning in 2016 and continuing through 2019. Now that Rodriguez faces personal liability arising from the false impression he created and maintained, he cannot be heard to complain. After all, the Bankruptcy Code is only for the honest but unfortunate debtor.

The evidence is clear MidFirst would not have made the Loan to KRR but for the false impression created by Rodriguez and Mathes. MidFirst believed Mathes, as manager, had full authority to act on behalf of KRR. Nothing given or provided to MidFirst during the opening of the Account or the making of the Loan suggested anything other than KRR was in the construction business, was wholly owned by Rodriguez, and was managed by Mathes.

The Court finds the totality of the false pretenses created by the concerted action of Rodriguez and Mathes from 2016 to 2019 wrongfully induced MidFirst to make the Loan.

### D.     MidFirst Suffered Damage as a result of the False Pretenses.

As equally clear as Rodriguez's knowing and intentional participation in a scheme to mislead MidFirst is MidFirst's calculation of damages. The parties stipulated the amount owed and unpaid under the Loan is $119,035.57 as of May 3, 2021.[5]

---

[5]In the Tenth Circuit, justifiable reliance is not specifically required for a false pretenses claim. See Sturgeon, 496 B.R. at 223. However, some courts consider it a necessary determination under any of the three types of conduct described in Section 523(a)(2)(A), including false pretenses. Alvarado, 608 B.R. at 884-85; Stevens v. Antonious (In re Antonious), 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006). Justifiable reliance does not look at whether the creditor's reliance was reasonable, i.e. whether an objectively reasonable person would have relied upon it; rather, it is a subjective inquiry, "whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." Johnson v. Riebesell (In re Riebesell), 586 F.3d 782, 791 (10th Cir. 2009). In determining whether a creditor's reliance is justifiable, the Court must examine the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." Riebesell, 586 F.3d at 792 (quoting Field, 516 U.S. at 74-75). Midfirst's reliance on Rodriguez's false pretenses is justifiable. Rodriguez, the 100% owner of KRR, represented Mathes as KRR's manager and provided Mathes' contact information. Midfirst had no reason to mistrust Rodriguez's representation. While Hickey did not communicate directly with Rodriguez regarding the Loan, it is common practice to communicate solely with the manager of a business regarding the making of a loan. Furthermore, Midfirst performed due diligence for the Loan by checking Dun & Bradstreet, LexisNexis, the Oklahoma Secretary of State, and other checks including whether KRR defaulted on any government guaranteed loans. Finally, throughout the Loan Application and DocuSign process, Mathes provided certain of Rodriguez's personal,

(continued...)

———————————————

Accordingly, the $119,035.57 debt owed to MidFirst Bank under the Loan, as guaranteed by Rodriguez, should be excepted from Rodriguez's discharge pursuant to Section 523(a)(6).

## CONCLUSION

The amount of the Loan, $119,035.57, is excepted from Rodriguez's discharge pursuant to Section 523(a)(2)(A).

IT IS SO ORDERED.

# # #

———————————————

[5](...continued)
confidential information.  Nothing in the transaction served as a "warning that [Midfirst was] being deceived," and Midfirst had no reason to suspect further investigation was warranted. Slack v. Woods (In re Woods), 616 B.R. 803, 814 (Bankr. N.D. Okla. 2020).  Midfirst, therefore, justifiably relied on the false pretenses created by Rodriguez.